1  Michael B. Reynolds (#174534)
   Jasmin Yang (#255254)
2  SNELL & WILMER L.L.P.
   600 Anton Boulevard
3  Suite 1400
   Costa Mesa, CA  92626-7689
4  Telephone: (714) 427-7000

5  Attorneys for Debtor-in-Possession
   Baby Trend, Inc.

6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                        **RIVERSIDE DIVISION**

11

12  In Re:                          CASE NO. 6:09-bk-34090

13  BABY TREND, INC.,               Chapter 11 Proceeding

14              Debtor-in-          **NOTICE OF EMERGENCY MOTION
                Possession.         AND EMERGENCY MOTION BY**
15                                  **DEBTOR FOR ENTRY OF AN ORDER
                                    AUTHORIZING DEBTOR TO OBTAIN**
16                                  **POST-PETITION FINANCING ON AN
                                    INTERIM BASIS PENDING A FINAL**
17                                  **HEARING; SUPPORTING
                                    MEMORANDUM OF POINTS AND**
18                                  **AUTHORITIES AND DECLARATIONS
                                    OF MICHAEL B. REYNOLDS AND**
19                                  **BRAD MATTAROCCI**

20                                  Hearing Information
                                    Date:    February 16, 2010
21                                  Time:    10:00 a.m.
                                    Ctrm:    3420 Twelfth Street, Ctrm 303
22                                           Riverside, California 92501

23

24

25      To:    **THE HONORABLE SHERI BLUEBOND, UNITED STATES**

26  **BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE,**

27  **AND ALL OTHER PARTIES ENTITLED TO NOTICE HEREOF:**

28

11115502

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

PLEASE TAKE NOTICE that at the above-stated time and date, in Courtroom 303 of the above-captioned Court located at 3420 Twelfth Street, Riverside, California, Baby Trend, Inc., the Debtor and Debtor-in-Possession herein (the "Debtor"), will and hereby does respectfully move the Court for an order authorizing it to obtain post-petition financing on an emergency, interim basis pending a final hearing pursuant to that certain Loan Agreement between the Debtor and Cathay Bank, a California banking corporation ("Cathay"). The Debtor proposes to use such financing to (1) pay off its existing debt to DBS Bank, Ltd., f/k/a the Development Bank of Singapore ("DBS"), and (2) to utilize the remainder of the credit line offered by Cathay for post-petition operations. By this motion, the Debtor essentially requests permission to substitute Cathay for DBS.

The Debtor is currently operating post-petition pursuant to a cash collateral stipulation with DBS. However, the Debtor's authorization to use DBS' cash collateral expires at the end of February 2010, and its loan with DBS matures at the end of April 2010. The Debtor and DBS have not agreed on terms for an extension of the loan's maturity date nor of the Debtor's authorization to use cash collateral. Moreover, the financing contemplated between the Debtor and Cathay could only be effective after eleven days beyond the date of an order approving the financing. Accordingly, the Debtor seeks approval of the financing on an emergency basis, so that the financing will be effective before the end of the month, when its authorization to use DBS' cash collateral will expire.

The proposed financing from Cathay is on better terms than that given by DBS. For openers, DBS refused to lend any further money and instead would only permit the Debtor to utilize cash collateral. Cathay, on the other hand, is permitting a revolving credit line *and* use of cash collateral. Cathay's proposed DIP loan will also not mature for a year, or upon the effective date of any Chapter 11 plan, whichever is sooner. The basic loan terms are also acceptable given the market today, and Cathay was the only lender with which the Debtor was able to reach terms.

1

**EMERGENCY RELIEF IS REQUESTED**

2    Pursuant to Local Bankruptcy Rules 2081-1(a), 4001-2(e), and 9075-1, the Debtor

3    requests that the Court consider the Debtor's Motion on an emergency basis so that any

4    relief granted may take effect as soon as possible, thereby authorizing the Debtor

5    immediately upon Court approval to pay off the DBS loan and continue using what will

6    become Cathay's cash collateral.

7    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), while the Court cannot

8    conduct a final hearing on this Motion earlier than 14 days after service of this Motion,

9    the Court may conduct a preliminary hearing before such 14-day period expires to enable

10    the Debtor to obtain the necessary take-out financing and use cash collateral as is

11    necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final

12    hearing. For the reasons noted herein and in the accompanying Memorandum of Points

13    and Authorities, the Debtor must be able to continue paying operating expenses pending a

14    final hearing in order to avoid immediate and irreparable harm to the Debtor's business

15    and its bankruptcy case.

16    **PLEASE TAKE NOTICE** that this Motion is based upon this Notice and Motion,

17    the Memorandum of Points and Authorities appended hereto, the Declarations of Michael

18    B. Reynolds and Brad Mattarocci concurrently filed herewith, the papers and pleadings on

19    file in this case, and such other evidence as may be presented to the Court.

20    **PLEASE TAKE NOTICE** that pursuant to Local Bankruptcy Rule 4001-2, the

21    Debtor represents that its proposed use of cash collateral will be pursuant to an order to be

22    presented in Court and does not and will not contain the following provisions:

23

24

| Provision | Proposed Order |
|---|---|
| Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law. | Not Applicable – Cathay was not a pre-petition lender. |

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

11115502

- 3 -

| Provision | Proposed Order |
|---|---|
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor. | Not Applicable – Cathay was not a pre-petition lender. |
| A provision that waives the estate's rights under 11 U.S.C. § 506(c) | Yes. |
| Provisions that grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, or 549. | Not Applicable – Cathay was not a pre-petition lender. |
| Use of postpetition loan from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b). | Not Applicable – Cathay was not a pre-petition lender. |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve-out. | Not Applicable – A creditors' committee has not been formed. |
| Provisions that prime any secured lien. | No. |

**PLEASE TAKE FURTHER NOTICE** that this Motion is being presented to the Court pursuant to the procedures set forth in Local Bankruptcy Rule 9075-1. Pursuant to such local rule, any response, written or oral, including any opposition or objection to the Motion may be presented at the time of the hearing on this Motion.

WHEREFORE, the Debtor respectfully requests that this Court enter an Order:

(a)    affirming the adequacy of the notice given;

(b)    granting the Motion on an interim basis pending a final hearing thereon;

(c)    authorizing the Debtor to obtain financing pursuant to the Loan Agreement with Cathay Bank, to utilize the loan proceeds to pay off DBS, and to continue using cash collateral to pay operating expenses as they arise in the course of the Debtor's business;

(d)    setting a final hearing on the Motion; and

(e)    granting such other and further relief as the Court deems just and proper.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

11115502

1    This Motion is based on this Notice of Motion and Motion, the following

2  Memorandum of Points and Authorities, the Supporting Declarations of Michael

3  Reynolds and Brad Mattarocci, and on such other and further matters as the Court may

4  allow.

5

6  Dated: February 9, 2010                    Respectfully submitted,

7                                             SNELL & WILMER L.L.P.

8

9                          By:    /s/ Michael B. Reynolds
                                  _____
10                                 Michael B. Reynolds
                                  Jasmin Yang
11                                 Attorneys for Baby Trend, Inc.,
                                  Debtor and Debtor-in-Possession herein

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## CASE BACKGROUND AND SUMMARY OF THE MOTION

### A.    General Background.

On October 9, 2009, Baby Trend, Inc. ("Baby Trend" or the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code. The Debtor is operating and managing its financial affairs as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Code. The Debtor's business operations consist of the manufacture, marketing, and sales of infant and toddler-related products, such as strollers, car seats, high chairs, walkers, nursery items, and travel systems. The Debtor is a worldwide leader in its industry and is well-regarded and well-known for offering high quality, functional products at affordable prices. In recent years, the Debtor has had annual sales revenue between $42 million and $50 million, and expects to have even greater revenues in 2010. It employs approximately 45 employees at its Ontario, California facilities.

The Debtor is operationally solvent, in that it is able to pay its operating expenses as they come due. However, the Debtor is balance-sheet insolvent and was plagued with litigation by an individual named Robert Gardner. Mr. Gardner, individually and through his wholly-owned limited liability company, Joovy, LLC ("Joovy"), has been pursuing litigation against the Debtor on two separate fronts in California and Texas. This bankruptcy filing was designed in part to put a halt to that litigation, to prevent Gardner from seizing the Debtor's assets and taking other actions that might be catastrophic to the Debtor's ongoing operations, and to permit the Debtor to reorganize its accrued indebtedness.

Specifically, the Debtor is the subject of a judgment for $8,099,772.00 (just over $9 million with attorney's fees and costs) entered on or about October 5, 2009 (the "Judgment") by the Orange County Superior Court (the "State Court") in favor of Mr. Gardner. In addition, Joovy has sued the Debtor for alleged patent infringement in the

1  United States District Court for the Northern District of Texas, Dallas Division (the

2  "Texas Action" and/or the "Patent Action").

3  　　　The Court has jurisdiction over this matter pursuant to 28 U.S.C. Sections 157 and

4  1334. This is a core proceeding pursuant to 28 U.S.C. Sections 157(b)(2)(D) and (M).

5  Venue is proper in this Court pursuant to 28 U.S.C. Sections 1408 and 1409.

6

7  **B.    Pre-Petition Credit Facility with DBS, Ltd.**

8  　　　Prior to the Petition Date, the Debtor financed its operations through a credit

9  facility/loan from DBS, under a Loan Agreement and Security Agreement, pursuant to

10  which the Debtor granted DBS a security interest in its personal property, including its

11  cash, accounts, inventory, and accounts receivable. DBS held (and continues to hold) a

12  valid, perfected, and enforceable security interest in the Debtor's personal property,

13  including the assets that constitute "cash collateral" as defined in Section 363(a) of the

14  Bankruptcy Code.

15

16  **C.    The DBS Cash Collateral Stipulation.**

17  　　　The Debtor, unable to survive without access to cash collateral, entered into a

18  Stipulation with DBS for Interim Use of Cash Collateral, which was approved by order of

19  this Court entered on or about October 15, 2009. Subsequently, on or about November

20  24, 2009, the Debtor and DBS entered into a Stipulation for continued use of cash

21  collateral, which the Court approved by order entered on or about December 3, 2009 (the

22  "DBS Cash Collateral Stipulation").

23  　　　The outstanding loan balance as of the petition date was approximately $7.2

24  million. As a result of DBS' refusal to honor certain outstanding letters of credit, the

25  Debtor was forced to pay down the loan balance over the course of the previous few

26  months. As a result, the outstanding loan balance as of February 5, 2010, is

27  approximately $6,473,803.02.

28

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1    The DBS Cash Collateral Stipulation expired after January 2, 2010. The Debtor

2    and DBS elected to extend the Cash Collateral Stipulation twice – at first, through

3    February 1, 2010, and then through March 3, 2010. The parties have not agreed on a

4    further extension of the Debtor's use of cash collateral. Further, the DBS Cash Collateral

5    Stipulation incorporates the maturity date of the existing DBS Loan Documents. Pursuant

6    to the Debtor's loan agreement with DBS, the loan matures and is due in full on April 30,

7    2010. DBS has indicated it is not interested in extending this date.

8

9    **D.    The Proposed DIP Financing Arrangement with Cathay.**

10    In order to pay off DBS, the Debtor has entered into a post-petition loan agreement,

11    security agreement and promissory note with Cathay. Of course, these agreements

12    (collectively, the "Cathay Loan Documents") are subject to approval by this Court. The

13    main features of the Cathay Loan Documents can be summarized as follows:

14    •    Cathay would extend DIP financing in the amount of $6.5 million to

15    pay off the DBS loan.

16    •    Cathay would substitute in as the senior secured lender, with a first-

17    priority lien encumbering substantially all of the Debtor's property, excepting

18    certain trademarks and retainer funds held by counsel.

19    •    The Debtor would be authorized to use cash collateral for ordinary

20    course business purposes.

21    •    The loan would not mature – and the Debtor's authorization to use

22    cash collateral would not expire – until the earlier of one year after the loan was

23    entered into, thirty days before the expiration of a Standby Letter of Credit supplied

24    by the Debtor's principals, or the effective date of a Chapter 11 Plan.

25    •    The Debtor would be authorized to pay down and to borrow

26    additional sums up to the $6.5 million figure; i.e., the loan would be a revolver.

27    •    Cathay would obtain a super-priority administrative claim to the

28    extent its lien rights did not adequately protect its interests.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

11115502

- 8 -

1    • In the event of a default that goes uncured after ten business days

2    written notice, Cathay would have relief from stay to pursue its non-bankruptcy

3    rights and remedies.

4

5    **E.    Bankruptcy Rule 4001 and Concise Statement of Relief.**

6        1.    Relief Requested.

7        The Debtor seeks an order authorizing it to enter into the Cathay Loan Documents

8    and to use cash collateral on an emergency basis to fund its operations, including its

9    payroll expenses due on the 3rd and 18th of each month, its operating expenses, including

10   its utility, manufacturing, shipping and administration expenses. The Debtor requests that

11   the Court authorize and approve the Cathay Loan and the use of cash collateral on an

12   interim basis, pending the Court's conduct of a final hearing on the Motion.

13

14       2.    Name of Each Entity with a Claim to an Interest in the Debtor's Property.

15       There are only two entities with liens against Property of the Debtor. DBS holds a

16   senior lien on essentially all estate property. However, DBS will be paid off through the

17   Cathay loan. In addition, certain trademarks are encumbered by a lien in favor of Grand

18   Pacific Trading Company. However, those trademarks will not be subject to the proposed

19   post-petition financing lien to be granted to Cathay.

20

21   **F.    Efforts to Obtain Financing from Other Sources.**

22       The Debtor's existing lender, DBS, refused to extend further credit upon the filing

23   of the petition. DBS has also refused to extend the maturity date of its pre-petition loan.

24   The Debtor inquired of asset-based lenders such as Business Funding, Inc., and Alpha

25   Business Loans, but was turned down. On the other hand, the Debtor already has a good

26   working relationship with Cathay (which handles letter of credit transactions for the

27   Debtor's overseas manufacturers). The Debtor's deal with Cathay is a "good fit" and also

28   the best deal available at present.

11115502

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

## II.

## THE COURT SHOULD APPROVE THE CATHAY LOAN

The Court should approve the Cathay loan because the prerequisites of Bankruptcy Code Section 364 are met and the loan is in the best interests of the estate and its creditors. *See, in re Ames Dept. Stores, Inc.*, 115 B.R. 34 (Bankr.S.D.N.Y. 1990) (the debtor's request to obtain secured financing was approved because all statutory prerequisites were met and obtaining the loan was in the best interests of the estate and its creditors.)

### A.      The Statutory Prerequisites Are Met.

Bankruptcy Code Section 364 governs post-petition secured lending, and states in pertinent part as follows:

> (c)      If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> > (1)      with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2)      secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3)      secured by a junior lien on property of the estate that is subject to a lien.
>
> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> > (A)      the trustee is unable to obtain such credit otherwise; and
> >
> > (B)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
> >
> > (2)      In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

In the present case, these prerequisites are met because the Debtor is unable to obtain credit otherwise and the only interest to be adequately protected – that of

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1   the proposed DIP lender, Cathay – will be adequately protected by its senior liens

2   against substantially all estate property.

3

4       1.      Credit is only Available to the Debtor on a Secured Basis.

5           As set forth above, the Debtor was unable to obtain a post-petition loan

6   from other sources.  Specifically, DBS refused to extend further credit once the

7   bankruptcy had been filed, and is also refusing to extend the maturity date of its

8   pre-petition loan.  Other asset based lenders that have made post-petition loans,

9   such as Business Funding, Inc., and Alpha Business Loans, were disinterested.  It

10  stands to reason that any lender providing "take out" financing for a previous loan

11  would want a lien on the same assets as the lender whose loan is to be "taken out."

12  And thus it is no surprise, and hardly unreasonable, that Cathay would insist on a

13  senior secured position for its loan.

14

15      2.      Cathay will be Adequately Protected.

16          This prong of the test is arguably inapplicable where, as here, no entity has a lien

17  against the property being offered as security for the debtor-in-possession loan (other than

18  the entity whose loan is being paid off).  Nevertheless, it is clear that Cathay's position is

19  adequately protected.  Its loan of $6.5 million is being secured by a lien on all inventory

20  and accounts receivable, among other things.  These items alone were valued at well over

21  the $6.5 million credit facility:

22

23          Accounts Receivable as of January 29, 2010:          $10,602,109

24          Inventory as of January 29, 2010:                    $  5,704,322

25          Total:                                               $16,306,431

26

27

28

11115502

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

**B.    The Agreement is in the Best Interests of the Debtor, the Estate and its
Creditors.**

As debtor-in-possession, the Debtor has authority to operate its business post-
petition. 11 U.S.C. § 1108. Inherent in this authority is the right to exercise reasonable
judgment in determining what is best for the business as well as for its creditors. *In re
Simasko Production Co.*, 47 B.R. 444, 449 (D.C. 1985), *citing In re Columbia Motor
Express, Inc.*, 33 B.R. 389 (M.D.Tenn. 1983). In *Simasko*, the debtor believed that the
operation of certain drilling facilities was necessary for its reorganization and would
benefit the estate and its creditors. *Id.* To operate them, however, the debtor needed to
obtain post-petition loans. *Id.* In approving the loans, the court stated as follows:

> Business judgments should be left to the board room and not
> to this Court [citation omitted].  Only in circumstances where
> there are allegations of, and a real potential for, abuse by the
> corporate insiders should the Court scrutinize the actions of
> the corporation [citations omitted].

*Id.*

Just as the drilling operations in *Simasko* were crucial to the success of the debtor's
business in that case, continuing the flow of funds to the Debtor in the present case is
critical to the Debtor's continued profitability.  Maintaining the Debtor's credit line and
ability to use cash collateral is essential to maintaining the stability of the Debtor's
operations, to meet the obligations to its manufacturers, and in turn, to meet the growing
demands of its customers.  A successful reorganization cannot take place if the Debtor is
unable to continue operating.

Since the terms of the Cathay loan are reasonable, within the Debtor's sound
business judgment, and in the best interests of the estate and its creditors, this Court
should grant the Debtor's motion.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

11115502

# IV.

## THE COURT SHOULD APPROVE THE

## CATHAY LOAN ON AN INTERIM BASIS

The Court may authorize on an interim basis the Debtor's financing and use of Cash Collateral to avoid immediate and irreparable harm to the Debtor's business and its estate. Pursuant Rules 4001(b)(2) and 4001(c)(2) of the Federal Rules of Bankruptcy Procedure, the Court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion, and may authorize the use of cash collateral only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. *See In re Center Wholesale, Inc.*, 759 F.2d 1440, 1449 (9th Cir. 1985) (noting the important of emergency relief allowing use of cash collateral during the commencement of a case).

As set forth above, it is critical that the Debtor be authorized to pay its expenses immediately and uninterruptedly in the ordinary course of its business. This includes payroll, which is due on the 3rd and 18th of each month. Furthermore, the Debtor must continue to pay for inventory to generate new accounts receivables. The Debtor must be able to pay for the manufacturing and purchase of the inventory in accordance with its agreements with manufacturing facilities and with retailers. In the event it is unable to do so, the manufacturing and the shipment of its inventory will cease. If the Debtor is not permitted to pay its employees and other critical expenses immediately and in the ordinary course of it business, the Debtor will likely be required to cease operations temporarily, which will be extremely damaging, if not fatal, to the Debtor's business. Therefore, the interim approval of the Cathay loan and use of cash collateral is necessary to avoid immediate and irreparable harm to the Debtor and its bankruptcy estate.

The Debtor requests that the Court set a final hearing as soon as the Court's calendar permits on a date approximately 14-21 days from the date of the initial hearing on the Motion, and authorize the Debtor to borrow funds and use cash collateral in accordance with the Cathay Loan Documents on an interim basis pending a final hearing.

### III.

### CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court enter an order:

(a)    affirming the adequacy of the notice given;

(b)    granting the Motion and approving the Cathay Loan Documents on an interim basis pending a final hearing thereon;

(c)    authorizing the Debtor to borrow funds pursuant to the Cathay Loan Documents and to use cash collateral;

(d)    setting a final hearing on the Motion; and

(e)    granting such other and further relief as the Court deems just and proper.

Dated: February 9, 2010                          Respectfully submitted,

                                                 SNELL & WILMER L.L.P.


                                          By:    /s/ Michael B. Reynolds
                                                 Michael B. Reynolds
                                                 Jasmin Yang
                                                 Attorneys for Baby Trend, Inc.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

11115502

- 14 -

## DECLARATION OF MICHAEL B. REYNOLDS

I, Michael B. Reynolds, declare as follows:

1.    I am a partner with the law firm of Snell & Wilmer LLP, general insolvency counsel for Baby Trend, Inc., the Debtor-in-Possession herein ("Baby Trend" and/or the "Debtor"). I am the lawyer at Snell & Wilmer primarily responsible for handling the Debtor's representation in this case. The matters set forth herein are of my own personal knowledge and, if called upon to do so, I could and would competently testify thereto.

2.    Attached hereto as Exhibit "A" is a true and correct copy of the proposed Loan Agreement between the Debtor and Cathay Bank ("Cathay"). Attached hereto as Exhibit "B" is a true and correct copy of the proposed Security Agreement between the Debtor and Cathay. Attached hereto as Exhibit "C" is a true and correct copy of the proposed Promissory Note from the Debtor to Cathay Bank. Attached hereto as Exhibit "D" is a true and correct copy of the proposed Post-Petition Financing Order.

3.    On or about October 15, 2009, this Court entered its order approving the Debtor's Stipulation for Interim Use of Cash Collateral with DBS Bank, Ltd. ("DBS"). On or about November 24, 2009, the Debtor and DBS entered into a Stipulation for continued use of cash collateral, which the Court approved by order entered on or about December 3, 2009 (the "DBS Cash Collateral Stipulation").

4.    The DBS Cash Collateral Stipulation expired after January 2, 2010. By and through counsel, the Debtor and DBS elected to extend the Cash Collateral Stipulation twice – at first, through February 1, 2010, and then through March 3, 2010. The parties have not agreed on a further extension of the Debtor's use of cash collateral. Further, the DBS Cash Collateral Stipulation incorporates the maturity date of the existing DBS Loan Documents. Pursuant to the Debtor's loan agreement with DBS, the loan matures and is

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

11115502

due in full on April 30, 2010.  I spoke with counsel for DBS on or about February 5, 2010,
and he indicated that DBS is not interested in extending this maturity date or extending
any financing to the Debtor.

5.    On or about February 5, 2010, I received an e-mail from DBS indicating
that the outstanding balance of the loan as of February 4 was $6,473,803.02.  A true and
correct copy of that e-mail is attached hereto as Exhibit "E".

6.    On behalf of the Debtor, I inquired of asset-based lenders such as Business
Funding, Inc., and Alpha Business Loans, regarding post-petition financing.  However, I
was unable to reach a suitable agreement with either lender.  In addition, as mentioned
above, the Debtor's existing lender is not interested in continuing the relationship.

I declare under penalty of perjury under the laws of the United States that
the foregoing is true and correct.  Executed this 9th day of February 2010, at Costa Mesa,
California.

Michael B. Reynolds

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

11115502

# DECLARATION OF BRAD MATTAROCCI

I, Brad Mattarocci, declare as follows:

1.     I am the General Manager of Baby Trend, Inc., the Debtor-in-Possession herein ("Baby Trend" and/or the "Debtor"). The matters set forth herein are of my own personal knowledge and, if called upon to do so, I could and would competently testify thereto.

2.     On or about October 9, 2009, Baby Trend commenced this case by filing its voluntary Chapter 11 bankruptcy petition. The Debtor is operating and managing its financial affairs as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Code. The Debtor's business operations consist of the manufacture, marketing, and sales of infant and toddler-related products, such as strollers, car seats, high chairs, walkers, nursery items, and travel systems. The Debtor is a worldwide leader in its industry and is well-regarded and well-known for offering high quality, functional products at affordable prices. In recent years, the Debtor has had annual sales revenue between $42 million and $50 million, and expects to have even greater revenues in 2010. It employs approximately 45 employees at its Ontario, California facilities.

3.     The Debtor is operationally solvent, in that it is able to pay its operating expenses as they come due. However, the Debtor is balance-sheet insolvent and was plagued with litigation by an individual named Robert Gardner. Mr. Gardner, individually and through his wholly-owned limited liability company, Joovy, LLC ("Joovy"), has been pursuing litigation against the Debtor on two separate fronts in California and Texas.

11115502

1       4.     Baby Trend is the subject of a judgment for $8,099,772.00 (just over $9

2  million with attorney's fees and costs) entered on or about October 5, 2009 (the

3  "Judgment") by the Orange County Superior Court (the "State Court") in favor of Mr.

4  Gardner. In addition, Joovy has sued the Debtor for alleged patent infringement in the

5  United States District Court for the Northern District of Texas, Dallas Division (the

6  "Texas Action" and/or the "Patent Action").

7

8       5.     Prior to the Petition Date, the Debtor financed its operations through a credit

9  facility/loan from DBS Bank, Ltd. ("DBS"), under a Loan Agreement and Security

10  Agreement, pursuant to which the Debtor granted DBS a security interest in its personal

11  property, including its cash, accounts, inventory, and accounts receivable. DBS held (and

12  continues to hold) a valid, perfected, and enforceable security interest in the Debtor's

13  personal property, including the assets that constitute "cash collateral" as defined in

14  Section 363(a) of the Bankruptcy Code.

15

16       6.     The outstanding loan balance owed to DBS as of the petition date was

17  approximately $7.2 million. As a result of DBS' refusal to honor certain outstanding

18  letters of credit, the Debtor was forced to pay down the loan balance over the course of the

19  previous few months. As a result, the outstanding loan balance as of February 5, 2010, is

20  approximately $6,473,803.02.

21

22       7.     In order to pay off DBS, the Debtor has entered into a post-petition loan

23  agreement, security agreement and promissory note with Cathay Bank ("Cathay"), subject

24  to this Court's approval.

25

26       8.     We seek to enter into the Cathay Loan Documents and to use cash collateral

27  on an emergency basis to fund our operations, including payroll expenses due on the 3rd

28  and 18th of each month, operating expenses, including utility, manufacturing, shipping and

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

11115502

administration expenses. We request that the Court authorize and approve the Cathay

Loan and the use of cash collateral on an interim basis, pending the Court's conduct of a

final hearing on the Motion.

9. There are only two entities with liens against Property of the Debtor. DBS

holds a senior lien on essentially all estate property. However, DBS will be paid off

through the Cathay loan. In addition, certain trademarks are encumbered by a lien in

favor of Grand Pacific Trading Company. However, those trademarks will not be subject

to the proposed post-petition financing lien to be granted to Cathay.

10. Our existing lender, DBS, refused to extend further credit upon the filing of

the petition. DBS has also refused to extend the maturity date of its pre-petition loan. On

the other hand, we already have a good working relationship with Cathay (which handles

letter of credit transactions for overseas manufacturers). Our proposed deal with Cathay is

a "good fit" and also the best deal available at present.

11. The proposed Cathay loan of $6.5 million is being secured by a lien on all

inventory and accounts receivable, among other things. These items alone were valued at

well over the $6.5 million credit facility:

| | |
|---|---|
| Accounts Receivable as of January 29, 2010: | $10,602,109 |
| Inventory as of January 29, 2010: | $ 5,704,322 |
| Total: | $16,306,431 |

I declare under penalty of perjury under the laws of the United States that

the foregoing is true and correct. Executed this 9 day of February 2010, at Costa Mesa,

California.

Brad Mattarocci

11115502

# EXHIBIT A

# LOAN AGREEMENT

This Loan Agreement dated as of February 11, 2010, is between Cathay Bank, a California banking corporation (the "Bank"), and Baby Trend, Inc., a California corporation, as Debtor-In-Possession, pursuant to Chapter 11 Bankruptcy Petition #6:09-bk-34090-BB (the "Bankruptcy Case") filed on October 9, 2009, in the United States Bankruptcy Court for the Central District of California (Riverside) (the "Bankruptcy Court") under Title 11 of the United States Code (the "Bankruptcy Code") (the "Borrower").

## 1.    LINE OF CREDIT AMOUNT AND TERMS

1.1    <u>Line of Credit Amount</u>.

(a)    During the availability period described below, the Bank will provide a line of credit to the Borrower. The amount of the line of credit is Six Million Five Hundred Thousand and 00/100 Dollars ($6,500,000.00) (the "Commitment").

(b)    This is a revolving line of credit. During the availability period, the Borrower may repay principal amounts and reborrow them.

(c)    The Borrower agrees not to permit the outstanding principal balance of advances plus the amount of any other type of credit outstanding under the line of credit to exceed the Commitment. If the Borrower exceeds this limit, the Borrower will pay the excess to the Bank immediately upon the Bank's demand.

1.2    <u>Availability Period</u>. The line of credit is available between the date of this Agreement and the earlier of (i) February 11, 2011, (ii) thirty (30) days prior to the expiration date of the SBLC (as herein defined), (iii) the date of termination as otherwise provided in this Agreement, or (iv) the effective date of any plan of reorganization in Borrower's Bankruptcy Case (the "Expiration Date").

1.3    <u>Promissory Note</u>. The obligation of the Borrower to repay the outstanding principal balance of all advances made under this Agreement, plus interest accrued thereon, shall be evidenced by a promissory note ("Note") in the amount of the Commitment, payable to the order of the Bank, duly executed by the Borrower of even date herewith. The interest rate and terms of repayment are set forth in the Note.

1.4    <u>Letters of Credit</u>.

(a)    During the availability period, at the request of the Borrower, the Bank will issue:

(i)    Commercial letters of credit with a maximum maturity not to extend beyond the earliest possible Expiration Date. Each commercial letter of credit will require drafts payable at sight.

(ii)    Standby letters of credit with a maximum maturity not to extend beyond the earliest possible Expiration Date.

(b)     In calculating the principal amount outstanding under the Commitment, the calculation shall include the amount of any letters of credit outstanding, including amounts drawn on any letters of credit and not yet reimbursed.

(c)     The Borrower agrees:

(i)     Any sum drawn under a letter of credit may, at the option of the Bank, be added to the principal amount outstanding under this Agreement. The amount will bear interest and be due as described elsewhere in this Agreement.

(ii)     If there is a default under this Agreement, to immediately prepay and make the Bank whole for any outstanding letters of credit.

(iii)     The issuance of any letter of credit and any amendment to a letter of credit is subject to the Bank's written approval and must be in form and content satisfactory to the Bank and in favor of a beneficiary acceptable to the Bank.

(iv)     To sign the Bank's form Application and Agreement for Commercial Letter of Credit or Application and Agreement for Standby Letter of Credit, as applicable.

(v)     To pay any issuance and/or other fees that the Bank notifies the Borrower will be charged for issuing and processing letters of credit for the Borrower.

(vi)     To allow the Bank to automatically charge its checking account for applicable fees, discounts, and other charges.

1.5     <u>Acceptances</u>. This line of credit may be used for financing acceptance transactions for a maximum tenor not to extend beyond the earliest possible Expiration Date. In calculating the principal amount outstanding under the Commitment, the calculation shall include the face amount of any acceptances outstanding. The Borrower agrees:

(a)     Any sum owed to the Bank under an acceptance may, at the option of the Bank, be added to the principal amount outstanding under this Agreement. The amount will bear interest and be due as described elsewhere in this Agreement.

(b)     If there is a default under this Agreement, to immediately prepay and make the Bank whole for any outstanding acceptances.

(c)     The issuance of any acceptance is subject to the Bank's express approval and must be in form and content satisfactory to the Bank.

(d)     To sign the Bank's standard form agreement for acceptances, and to pay any issuance and/or other fees that the Bank notifies the Borrower will be charged for issuing and processing acceptances for the Borrower.

(e)     To allow the Bank to automatically charge its checking account for applicable fees, discounts, and other charges.

1.6   Interest Reserve Account.  On or before the date of execution of this Agreement, the Borrower agrees to deposit an amount equal to Three Hundred Ninety Thousand Dollars ($390,000.00), being twelve months of interest on the Commitment calculated at six percent (6%), in an interest bearing account maintained at and controlled by the Bank ("Interest Reserve Account").  Borrower hereby grants Bank a security interest in the Interest Reserve Account.  Borrower acknowledges and agrees that Borrower may not withdraw money from the Interest Reserve Account, and that Bank shall draw down from such account to pay interest charges as incurred.

## 2.   FEES

2.1   Loan Fee.  The Borrower agrees to pay a loan fee in the amount of Five Thousand Dollars ($5,000.00).  This fee is due on the date of this Agreement.

2.2   Reimbursement Costs.  The Borrower agrees to reimburse the Bank for any reasonable expenses it incurs in the preparation of this Agreement and any agreement or instrument required by this Agreement.  Expenses include, but are not limited to, reasonable attorneys' fees, including any allocable costs of the Bank's in-house counsel to the extent permitted by applicable law.

## 3.   DISBURSEMENTS, PAYMENTS AND COSTS

3.1   Disbursements and Payments.

(a)   Each payment by the Borrower will be made in U.S. Dollars and immediately available funds by direct debit to a deposit account as specified below or, for payments not required to be made by direct debit, by mail to the address shown on the Borrower's statement or at one of the Bank's banking centers in the United States.

(b)   Each disbursement by the Bank and each payment by the Borrower will be evidenced by records kept by the Bank.  In addition, the Bank may, at its discretion, require the Borrower to sign one or more promissory notes.

3.2   Telephone and Telefax Authorization.

(a)   The Bank may honor telephone or telefax instructions for advances or repayments given, or purported to be given, by the Borrower.

(b)   Advances will be deposited in an account owned by the Borrower with the Bank as designated in writing by the Borrower.

The Borrower will indemnify and hold the Bank harmless from all liability, loss, and costs in connection with any act resulting from telephone or telefax instructions the Bank reasonably believes are made by the Borrower.  Notwithstanding the foregoing, the Borrower shall have no obligation to Bank for any liability, loss or costs to the extent arising from the gross negligence or willful misconduct of Bank or any of its officers, employees or agents as determined in a final, non-appealable decision of a court of competent

jurisdiction or of an arbitration panel. This paragraph will survive this Agreement's termination, and will benefit the Bank and its officers, employees, and agents.

    3.3    <u>Direct Debit</u>.

    (a)    The Borrower agrees that interest and/or authorized principal payments and fees will be deducted automatically on the due date from Borrower's account number 42004268 at the Bank or such other account owned by the Borrower with the Bank as designated in writing by the Borrower (the "Designated Account").

    (b)    The Borrower will maintain sufficient funds in the Designated Account on the date the Bank enters any debit authorized by this Agreement. If there are insufficient funds in the Designated Account on the date the Bank enters any debt authorized by this Agreement, the Bank may reverse the debit.

    3.4    <u>Banking Days</u>. Unless otherwise provided in this Agreement, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located, and, if such day relates to amounts bearing interest at an offshore rate (if any), means any such day on which dealings in dollar deposits are conducted among banks in the offshore dollar interbank market. All payments and disbursements which would be due on a day which is not a banking day will be due on the next banking day. All payments received on a day which is not a banking day will be applied to the credit on the next banking day.

    3.5    <u>Taxes</u>. If any payments to the Bank under this Agreement are made from outside the United States, the Borrower will not deduct any foreign taxes from any payments it makes to the Bank. If any such taxes are imposed on any payments made by the Borrower (including payments under this paragraph), other than the Bank's income taxes, the Borrower will pay the taxes and will also pay to the Bank, at the time interest is paid, any additional amount which the Bank specifies as necessary to preserve the after-tax yield the Bank would have received if such taxes had not been imposed. The Borrower will confirm that it has paid the taxes by giving the Bank official tax receipts (or certified copies) within thirty (30) days after the due date.

    3.6    <u>Interest Calculation</u>. Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. This results in more interest or a higher fee than if a 365-day year is used. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid.

    3.7    <u>Default Rate</u>. Upon the occurrence of any default under this Agreement, all principal amounts outstanding under this Agreement, will at the option of the Bank bear interest at a rate which is four (4) percentage point(s) higher than the rate of interest otherwise provided under this Agreement. This will not constitute a waiver of any default.

### 4. COLLATERAL AND OTHER SUPPORT

4.1    <u>Personal Property</u>.  The Borrower's obligations to the Bank under this Agreement will be secured by all of the personal property the Borrower now owns, including pre and post bankruptcy petition property and all property of the Bankruptcy Case estate, or will own in the future, including, without limitation, (a) equipment, (b) inventory, (c) accounts receivable, and (d) patents, trademarks and other general intangibles, but excluding retainer funds held by Borrower's counsel.  The collateral is further defined in the security agreement of even date herewith executed by the Borrower (the "Security Agreement").  In addition, all personal property collateral securing this Agreement shall also secure all other present and future obligations of the Borrower to the Bank (excluding any consumer credit covered by the Federal Truth in Lending law, unless the Borrower has otherwise agreed in writing).  All personal property collateral securing any other present or future obligations of the Borrower to the Bank shall also secure this Agreement.

4.2    <u>Standby Letter of Credit</u>.  The Borrower shall cause to be delivered, on or before the date of this Agreement, an irrevocable and unconditional standby letter of credit (the "SBLC") issued by Taiwan Cooperative Bank in favor of the Bank, in the amount of the Commitment and on terms acceptable to the Bank, and confirmed by a financial institution acceptable to the Bank ("Confirming SBLC").

### 5. CONDITIONS

The Bank must receive the following items, in form and content acceptable to the Bank, before it is required to extend any credit to the Borrower under this Agreement:

5.1    <u>Authorizations</u>.  Evidence that the execution, delivery and performance by the Borrower and each guarantor of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

5.2    <u>Governing Documents</u>.  A copy of the Borrower's articles of incorporation and evidence of good standing.

5.3    <u>Loan Documents</u>.  Signed originals of the following documents (the "Loan Documents") required by Bank:

       (a)    this Agreement;

       (b)    the Note;

       (c)    the Security Agreement;

       (d)    the original SBLC and Confirming SBLC; and

       (e)    a continuing guaranty , duly executed by Denny Tsai, an individual, and Betty Tsai, an individual, (individually and collectively, the "Guaranty").

5.4    <u>Perfection and Evidence of Priority</u>. Financing statements (and any collateral in which the Bank requires a possessory security interest), together with evidence that the security interests and liens in favor of the Bank are valid, enforceable, and prior to all others' rights and interests, except those the Bank consents to in writing.

5.5    <u>Bankruptcy Court Approval</u>.

(a)    The Bankruptcy Court in the Bankruptcy Case shall have entered its order under the  Bankruptcy Code approving the Borrower obtaining the financing set forth in the Loan Documents and granting the collateral defined herein and in the Security Agreement. Bank's lien on Borrower's collateral shall be the senior-most lien on such collateral.  The order shall  provide, among other things, that Bank has negotiated with the Bankruptcy Estate (as defined in the Bankruptcy Code), provided the financing, and entered into the Loan Documents in good faith pursuant to the provisions of 11 U.S.C. §364, including without limitation subparagraph (e), and if said financing is approved over the objection of any party in interest, eleven (11) days shall have transpired since the entry of such approval order and the approval order shall not have been stayed pending appeal during such time.

(b)    The Borrower shall have given notice of the motion to the Bankruptcy Court in the Bankruptcy Case to approve this financing and these Loan Documents, as required under applicable bankruptcy law, to the satisfaction of the Lender in its sole opinion and judgment.

(c)    The liens granted to the Bank shall be senior in priority to any and all replacement liens granted in the Bankruptcy Case.

5.6    <u>Payment of Fees</u>.  Payment of all accrued and unpaid expenses incurred by the Bank as required by the paragraph entitled "Reimbursement Costs."

5.7    <u>Accounts at Bank</u>.  Borrower shall have opened the Interest Reserve Account and the Designated Accounts as required under this Agreement.

5.8    <u>Pending Litigation Letter</u>.  A letter from counsel to the Borrower reporting the status of all pending litigation and the impact of such litigation on the Borrower, including, without limitation, the pending cases involving wrongful termination (<u>Gardner vs. Baby Trend, Inc.</u>) and patent infringement (<u>Gardner/Joovy vs. Baby Trend/Target</u> and <u>Link Treasure vs. Baby Trend, Inc.</u>)

5.9    <u>Other Items</u>.  Any other items that the Bank reasonably requires.

**6.    REPRESENTATIONS AND WARRANTIES**

When the Borrower signs this Agreement, and until the Bank is repaid in full, the Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

6.1    <u>Formation</u>.  The Borrower is duly formed and existing under the laws of the State of California.

6.2    Authorization. This Agreement, and any instrument or agreement required hereunder, are within the Borrower's powers, have been duly authorized, including authorization by the Bankruptcy Court, and does not conflict with any of its organizational papers.

6.3    Enforceable Agreement. This Agreement is a legal, valid and binding agreement of the Borrower, enforceable against the Borrower in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable.

6.4    Good Standing. The Borrower is properly licensed and in good standing in the state of California, and, where required, in compliance with fictitious name statutes.

6.5    No Conflicts. This Agreement does not conflict with any law, agreement, or obligation by which the Borrower is bound.

6.6    Financial Information. All financial and other information that has been or will be supplied to the Bank is sufficiently complete to give the Bank accurate knowledge of the financial condition of the Borrower, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Bank, there has been no material adverse change in the financial condition or properties of the Borrower.

6.7    Lawsuits. There is no lawsuit, tax claim or other dispute pending or threatened against the Borrower which, if lost, would impair the Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to the Bank.

6.8    Borrower Not a "Foreign Person". The Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended from time to time.

6.9    No Event of Default. There is no event which is, or with notice or lapse of time or both would be, a default under this Agreement.

6.10    Collateral. All collateral required in this Agreement is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except those which have been approved by the Bank in writing.

7.    COVENANTS

The Borrower agrees, so long as credit is available under this Agreement and until the Bank is repaid in full:

7.1    Use of Proceeds. To use the proceeds of the Commitment for repayment of prepetition indebtedness owed to DBS Bank, working capital and the issuance of letters of credit and acceptance.

7.2    Financial and Other Information. To provide the Bank the following financial information and statements in form and substance satisfactory to the Bank in the

exercise of its reasonable discretion, and such additional reasonable information as requested by the Bank from time to time.

(a)     Within 120 days of the Borrower's fiscal year end, the Borrower's annual financial statements. These financial statements shall be reviewed by a Certified Public Accountant acceptable to the Bank. The statements shall include, at a minimum, the Borrower's balance sheet and statements of income, retained earnings and cash flow, and a statement of shareholder equity for such year.

(b)     Within thirty (30) days of the period's end, the Borrower's quarterly financial statements for the fiscal quarters ending March 31, June 30, September 30 and December 31. These financial statements may be Borrower prepared, and must include, at a minimum, the Borrower's balance sheet and statements of income.

(c)     Within thirty (30) days of the end of each calendar year, the annual financial statements of the Guarantor. The financial statements may be self-prepared.

(d)     Copies of the federal income tax refund for the Borrower, within 30 days of filing, and, if requested by the Bank, copies of any extensions of the filing date.

(e)     A detailed aging of the Borrower's accounts receivable by invoice or a summary aging by account debtor, as specified by the Bank, within twenty (20) days after the end of each calendar quarter.

(f)     A summary aging by vendor of accounts payable within twenty (20) after the end of each calendar quarter.

(g)     An inventory listing within twenty (20) days after the end of each calendar quarter.

(h)     Within twenty (20) days of the end of each calendar quarter, a letter from counsel to Borrower, reporting the status of all pending litigation and the impact of such litigation on the Borrower, including, without limitation, the pending cases involving wrongful termination (Gardner vs. Baby Trend, Inc.) and patent infringement (Gardner/Joovy vs. Baby Trend/Target and Link Treasure vs. Baby Trend, Inc.)

(i)     Promptly upon the Bank's request, such other books, records, statements, lists of property and accounts, budgets, forecasts or reports as to the Borrower and as to each guarantor of the Borrower's obligations to the Bank as the Bank may request.

7.3     Notices. To promptly notify the Bank in writing of:

(a)     Any notice that the Borrower fails in any material respect to comply with any applicable law, regulation or court order;

(b)     Any substantial dispute between the Borrower and any government authority;

(c)     Any material adverse change in the Borrower's financial condition or properties, or ability to repay the loan; and

(d)     any event of default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an event of default.

7.4     <u>Books and Records; Audits</u>.  To maintain adequate books and financial records and to allow the Bank and its agents to inspect its properties and examine, audit, and make copies of such records at any reasonable time; provided, however, prior to an Event of Default, audits will be conducted not more frequently than once in any twelve month period, at a cost to the Borrower not exceeding $1,200.00.  If any of the Borrower's books or records are in the possession of a third party, the Borrower authorizes that third party to permit the Bank or its agents to have access to perform inspections or audits and to respond to the Bank's requests for information concerning such properties, books and records.

7.5     <u>Other Debts</u>.  Not to have outstanding any direct or contingent liabilities or lease obligations, or become liable for the liabilities of others, engage in any debt restructure, or accelerate payment of any existing debt, without the Bank's written consent.  This does not prohibit:

(a)     Acquiring goods, services, supplies or merchandise on normal trade credit.

(b)     Endorsing negotiable instruments received in the usual course of business.

(c)     Obtaining surety bonds in the usual course of business.

7.6     <u>Other Liens</u>.  Not to create, assume, or allow any security interest or lien (including judicial liens) on property the Borrower now or later owns, except:

(a)     Liens and security interests in favor of the Bank.

(b)     Liens for taxes not yet due.

(c)     Liens outstanding on the date of this Agreement disclosed to the Bank in writing.

7.7     <u>Maintenance of Assets</u>.

(a)     Not to sell, assign, lease, transfer or otherwise dispose of any part of the Borrower's business or the Borrower's assets except in the ordinary course of the Borrower's business.

(b)     Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

(c)      Not to enter into any sale and leaseback agreement covering any of its fixed assets.

(d)      To maintain and preserve all rights, privileges, and franchises the Borrower now has.

7.8      Additional Negative Covenants.  Not to, without the Bank's written consent:

(a)      Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

(b)      Acquire or purchase a business or its assets.

(c)      Engage in any business activities substantially different from the Borrower's present business.

(d)      Liquidate or dissolve the Borrower's business.

(e)      Voluntarily suspend its business.

7.9      Profitability.  To maintain a positive net income before taxes and extraordinary items for each quarterly reporting period, on a year to date basis.

7.10      Insurance.

(a)      General Business Insurance.  To maintain insurance as is usual for the Borrower's business, including business insurance in an amount not less than Three Million Dollars ($3,000,000.00), and product liability insurance in an amount not less than Five Million Dollars ($5,000,000.00).

(b)      Evidence of Insurance.  Upon the request of the Bank, to deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

7.11      Compliance with Laws.  To comply with the laws (including any fictitious or trade name statute), regulations, and orders of any government body with authority over the Borrower's business.  The Bank shall have no obligation to make any advance to the Borrower except in compliance with all applicable laws and regulations and the Borrower shall fully cooperate with the Bank in complying with all such applicable laws and regulations.

7.12      ERISA Plans.  Promptly during each year, to pay and cause any subsidiaries to pay contributions adequate to meet at least the minimum funding standards under ERISA with respect to each and every Plan; file each annual report required to be filed pursuant to ERISA in connection with each Plan for each year; and notify the Bank within ten (10) days of the occurrence of any Reportable Event that might constitute grounds for termination of any capital Plan by the Pension Benefit Guaranty Corporation or for the appointment by the

appropriate United States District Court of a trustee to administer any Plan. "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time. Capitalized terms in this paragraph shall have the meanings defined within ERISA.

7.13    Perfection of Liens. To help the Bank perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

7.14    Cooperation. To take any action reasonably requested by the Bank to carry out the intent of this Agreement.

7.15    Change of Ownership. Not to cause, permit, or suffer any change in capital ownership of the Borrower.

7.16    Investments. Not to have any existing, or make any new investments in any individual or entity, or make any capital contributions or other transfers of assets for investment purposes to any individual or entity, except for:

(a)    U.S. government obligations.

(b)    Commercial paper with a maturity of less than one (1) year rated Moody's P-1 or better and/or S&P A1 or better.

(c)    Federally insured certificates of deposits.

(d)    Repurchase obligations with terms not more than seven (7) days, other than product defect repurchase obligations whose terms shall not exceed sixty (60) days.

(e)    Money market funds that invest solely in (a) through (d) above.

7.17    Loans. Not to, without the Bank's written consent, make any loans, advances or other extension of credit to any individual or entity, except for:

(a)    Existing extensions of credit disclosed to the Bank in writing.

(b)    Extensions of credit to the Borrower's current subsidiaries.

(c)    Extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to non-affiliated entities.

7.18    Capital Expenditures. Not to, without the Bank's written consent, spend or incur obligations (including the total amount of any capital leases) to acquire fixed assets for more than Two Hundred Thousand Dollars ($200,000.00) in any single fiscal year.

## 8.    HAZARDOUS SUBSTANCES

8.1    Indemnity Regarding Hazardous Substances. The Borrower will indemnify and hold harmless the Bank from any loss or liability the Bank incurs in connection

with or as a result of this Agreement, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous substance is on, under or about the Borrower's property or operations or property leased to the Borrower. The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). The indemnity extends to the Bank, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

8.2     Definition of Hazardous Substances. "Hazardous substances" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas. This indemnity will survive repayment of the Borrower's obligations to the Bank.

## 9.    DEFAULT

If any of the following events (each an "Event of Default") occurs the Bank may do one or more of the following, if said Event of Default is not cured on or before the tenth (10th) business day following written notice to Borrower of said Event of Default: declare the Borrower in default, stop making any additional credit available to the Borrower, require the Borrower to repay its entire debt immediately and without prior notice, and/or enforce any other remedy available under applicable law. If an event which, with notice or the passage of time, will constitute an Event of Default has occurred and is continuing, the Bank has no obligation to make advances or extend additional credit under this Agreement. Notwithstanding the foregoing, if an Event of Default occurs under the paragraph entitled "Bankruptcy," below, with respect to the Borrower, then the entire debt outstanding under this Agreement will automatically be due immediately.

9.1     Failure to Pay. The Borrower fails to make any payment of principal or interest on the loan when due, or the Borrower fails to make any other payment required under this Agreement within ten (10) days after written demand by the Bank.

9.2     Lien Priority. The Bank fails to have an enforceable first lien on or security interest in any property given as security for this Agreement (except for prior liens approved by the Bank in writing).

9.3     False Information. The Borrower has given the Bank materially false or misleading information or representations.

9.4     Bankruptcy.

(a)     Any order shall be entered in the Bankruptcy Case converting the case to a proceeding under any provision of the Bankruptcy Code other than Chapter 11; or dismissing the case.

(b)    Any Trustee shall be appointed in the Bankruptcy Case for any reason, including without limitation, under Chapter 11 of the Bankruptcy Code, or otherwise.

(c)    The Borrower, or any other party in interest and/or creditor, shall propose any plan of reorganization that seeks to vary, amend, modify, or change in any respect the terms, covenants, and conditions of the Loan Documents, without the prior written consent of Bank, which consent may be given or withheld in the exercise of Bank's sole opinion and discretion.

(d)    The Borrower, or any other party in interest and/or creditor shall file or commence any proceeding in any court of competent jurisdiction to challenge the validity, priority, or extent of any lien granted to Bank under the Loan Documents, including, without limitation, any adversary proceeding in the Bankruptcy Case or with respect to the terms, covenants, and conditions contained in any proposed plan of reorganization, which proceeding is not dismissed within sixty (60) days.

(e)    Any motion or proceeding shall be filed in the Bankruptcy Case seeking to surcharge the Bank for any reason, or to "prime" any lien held by the Bank, or to provide any lien to any third party on collateral of the Bank with a senior lien priority, equal lien priority, or junior lien priority, which motion or proceeding is not dismissed within sixty (60) days.

9.5    <u>Liquidation</u>.  The Borrower dissolves or liquidates.

9.6    <u>Judgments.</u>  Any judgments or arbitration awards are entered against the Borrower, or the Borrower enters into any settlement agreements with respect to any litigation or arbitration, in an aggregate amount of One Hundred Thousand Dollars ($100,000.00) or more in excess of any insurance coverage, other than with respect to the pending litigation disclosed in writing pursuant to Section 5.8 hereof.

9.7    <u>Government Action</u>.  Any government authority takes action that the Bank believes materially adversely affects the Borrower's intended use of the Property, or the Borrower's financial condition or ability to repay the loan, which breach continues unremedied for a period of ten (10) business days after the date on which the Bank gives written notice of such breach to the Borrower.

9.8    <u>Material Adverse Change</u>.  A material adverse change occurs, or is reasonably likely to occur, in the Borrower's financial condition, operations, properties or prospects, or ability to repay the loan, which breach continues unremedied for a period of ten (10) business days after the date on which the Bank gives written notice of such breach to the Borrower.

9.9    <u>Default under Related Documents</u>.  Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement.

9.10    _Other Bank Agreements_.  The Borrower fails to meet the conditions of, or fails to perform any obligation under, any other agreement the Borrower has with the Bank or any affiliate of the Bank.

9.11    _Other Breach Under Agreement_.  The Borrower fails to meet the conditions of, or fails to perform any obligation under, any term of this Agreement not specifically referred to in this Article.  This includes any failure by the Borrower to comply with any financial covenants set forth in this Agreement, whether such failure is evidenced by financial statements delivered to the Bank of is otherwise known to the Borrower or the Bank.

9.12    _SBLC/Confirming SBLC_.  The SBLC and/or the Confirming SBLC expires or is no longer in effect for any reason.

## 10.    BANKRUPTCY CASE ADMINISTRATION

10.1    _Administrative Claim Super Priority_.  To the extent not adequately protected by the liens conferred and contemplated hereunder, Bank shall be granted an administrative priority claim with regard to the payment and performance by Borrower of all terms, covenants, and conditions under the Loan Documents, including, without limitation, repayment of all amounts advanced by Bank to Borrower, and such administrative claim shall have the super priority as provided in 11 U.S.C. §507(b) for failed adequate protection, all of the terms, covenants, conditions, and liens granted to Bank herein being in the nature of a grant of adequate protection such that failure of Bank to be repaid in full in a timely manner from Borrower or from any collateral shall be and shall be deemed to be a failure of adequate protection.

10.2    _Grant of Relief From The Automatic Stay_.  The automatic stay of 11 U.S.C. §362 shall not apply to, and shall be deemed modified, amended, annulled and terminated as to Bank with respect to Bank's enforcement of any and all rights and remedies granted to Bank under the Loan Documents and applicable state and federal law, including without limitation enforcement by Bank of any and all liens granted to Bank to secure payment and performance of the obligations of Borrower under the Loan Documents and the ability of Bank to draw on any and all letters of credit in that regard, all without further order of the Bankruptcy Court.

10.3    _Preservation of Credit Bid Rights_.  All credit bidding rights of Bank including, but not limited to, under 11 U.S.C. §363(k), shall be preserved at all times in addition to all other rights and remedies of Bank under the Loan Documents and applicable state and/or federal law.

10.4    _No Surcharge Claim_.  No surcharge claim, including without limitation, under 11 U.S.C. §506(c), shall be asserted against the Bank.

10.5    _Post-Petition Requests_.  No post-petition financing requests shall be made, including without limitation, under 11 U.S.C. §364, unless the same is to pay Bank in full as a condition to any such financing.

## 11.    ENFORCING THIS AGREEMENT; MISCELLANEOUS

11.1    GAAP. Except as otherwise stated in this Agreement, all financial information provided to the Bank and all financial covenants will be made in accordance with accounting principles applied consistently with those applied in the preparation of Borrower's financial statements most recently provided to the Bank.

11.2    California Law. This Agreement is governed by California law, unless preempted by federal law with respect to bankruptcy issues.

11.3    Heirs, Successors and Assigns. The terms of this Agreement shall bind and benefit the heirs, legal representatives, successors and assigns of the parties; provided, however, that the Borrower may not assign this Agreement without the prior written consent of the Bank. The Bank has the right to transfer the loan to any other persons or entities without the consent of or notice to the Borrower. Without the consent of or notice to the Borrower, the Bank may disclose to any prospective purchaser of any securities issued by the Bank, and to any prospective or actual purchaser of any interest in the loan, any financial or other information relating to the Borrower, the loan or the Property.

11.4    Waivers. No alleged waiver by the Bank is effective unless in writing, and no waiver may be construed as a continuing waiver. No waiver is implied from any delay or failure by the Bank to take action on account of any default of the Borrower. Consent by the Bank to any act or omission by the Borrower may not be construed as a consent to any other or subsequent act or omission.

11.5    Attorneys' Fees. The Borrower shall reimburse the Bank for any reasonable costs and attorneys' fees incurred by the Bank in connection with the enforcement or preservation of any rights or remedies under this Agreement and any other documents executed in connection with this Agreement, and in connection with any amendment, waiver, "workout" or restructuring under this Agreement. In the event of a lawsuit or arbitration proceeding, the prevailing party is entitled to recover costs and reasonable attorneys' fees incurred in connection with the lawsuit or arbitration proceeding, as determined by the court or arbitrator. Bank is entitled to recover costs and reasonable attorneys' fees incurred by the Bank related to the preservation, protection, or enforcement of any rights of the Bank in the Bankruptcy Case. As used in this paragraph, "attorneys' fees" includes the allocated costs of the Bank's in-house counsel.

11.6    One Agreement. This Agreement and any related security or other agreements required by this Agreement, collectively:

(a)    represent the sum of the understandings and agreements between the Bank and the Borrower concerning this credit;

(b)    replace any prior oral or written agreements between the Bank and the Borrower concerning this credit; and

(c)    are intended by the Bank and the Borrower as the final, complete and exclusive statement of the terms agreed to by them.

In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

11.7   Indemnification. The Borrower will indemnify and hold the Bank harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (a) this Agreement or any document required hereunder, (b) any credit extended or committed by the Bank to the Borrower hereunder, and (c) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit. This indemnity includes but is not limited to attorneys' fees (including the allocated cost of in-house counsel). This indemnity extends to the Bank, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys, and assigns. This indemnity will survive repayment of the Borrower's obligations to the Bank. All sums due to the Bank hereunder shall be obligations of the Borrower, due and payable immediately without demand.

11.8   Miscellaneous. This Agreement may not be modified or amended except by a written agreement signed by the parties. The invalidity or unenforceability of any one or more provisions of this Agreement in no way affects any other provision. If the Borrower consists of more than one person or entity, each is jointly and severally liable to the Bank for repayment of the loan. Any person who is now or hereafter a general partner of the Borrower is jointly and severally liable for performance of the Borrower's obligations under this Agreement. Time is of the essence in the performance of this Agreement and any other instrument or agreement required by this Agreement. This Agreement may be executed in one or more counterparts, each of which is, for all purposes deemed an original and all such counterparts taken together, constitute one and the same instrument.

11.9   USA Patriot Act Notice. Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. The Bank will ask for the Borrower's legal name, address, tax ID number or social security number and other identifying information. The Bank may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of the Borrower, guarantors or other related persons.

11.10   JURY TRIAL WAIVER. IN ANY ACTION BROUGHT BY LENDER, BORROWER OR ANY THIRD PARTY ARISING UNDER THIS AGREEMENT, THE NOTE, THE DEED OF TRUST, THE ASSIGNMENT OF LEASES, THE ENVIRONMENTAL INDEMNITY, THE CONTINUING GUARANTY, OR ANY OF THE OTHER LOAN DOCUMENTS, OR ANY DOCUMENT OR INSTRUMENT EXECUTED IN CONNECTION THEREWITH, INCLUDING, WITHOUT LIMITATION, ANY ACTION BASED UPON FRAUD, NEGLIGENCE, BREACH OF CONTRACT, WASTE, INTENTIONAL TORT OR NEGLIGENT TORT, TO THE EXTENT PERMITTED BY LAW, BORROWER HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY AND AGREES THAT SUCH ACTION SHALL BE TRIED BY THE COURT ONLY. BORROWER FURTHER AGREES TO EXECUTE AND TO FILE WITH ANY COURT IN WHICH ANY SUCH ACTION IS COMMENCED, ANY DOCUMENTS OR INSTRUMENTS NECESSARY TO EVIDENCE OR TO EFFECTUATE THIS WAIVER OF TRIAL BY JURY.

Borrower has initialed this Section 10.10 to further indicate its awareness and acceptance of each and every provision hereof.


_____
Borrower's Initials


[Signature page to follow.]

This Agreement is executed as of the date stated at the top of the first page.

BANK:

CATHAY BANK,
a California Banking Corporation

BORROWER:

BABY TREND, INC.
a California corporation,
as Debtor-In-Possession

By: _____
Name: _____
Title: _____

By: _____
Name:  Betty Tsai
Title:  Chief Executive Officer and Secretary

Address where notices to the Bank
are to be sent:

Mail Code:  EL-6-A
9650 Flair Drive, 6th Floor
El Monte, CA 91731

Address where notices to the Borrower
are to be sent:

1607 South Campus Avenue
Ontario, CA 91761

663101.5

18